JaWILLIAM V. REDMANN, Judge Pro Tem.
Defendant employer appeals a workers’ compensation award of supplemental earnings benefits under La.R.S. 23:1221(3), for work injury producing inability to earn 90% of his former wages.
Plaintiff employee’s disability to work free of pain with arms overhead and head turned existed (because of congenital bone anomalies) from the time he started a new assignment of overhead work, and is not proved to *659 be the result of any injury at work. Nor did plaintiff provide any evidence that his inability to work with arms overhead prevented his earning, on some other job, 90% of his former wages.
We therefore reverse.
Plaintiff has a congenital skeletal condition, his medical witness testifies, such that working with his arms overhead, especially with his head turned, so restricts the thoracic outlet for his neurovascular bundle as to irritate the nerves, causing him such pain and muscle spasm that overhead work is contraindicated for him.[2] His work assignment for defendant required substantial laoverhead work with turned head.[3] Plaintiff himself advised his employer in writing, two days before he quit work because of a “sharp, sharp stabbing pain,” that five doctors agreed he “must pursue a new line of work.”
Plaintiff had had previous non-work incidents of more violent injury and similar pain,[4] and previous work incidents of sharp, *660 Uknife-like, stabbing pain; but he claims disabling injury from an incident of October 23, 1991, when he felt a “sharp, sharp stabbing pain” in his back while twisting a fuel nozzle into an airliner’s under-wing fuel valve.
On October 21, two days before that particular stabbing pain incident, plaintiff had delivered to his employer a handwritten document titled “Topic, Patrick B. Holley filing for Workmen’s Compensation.” That document declared:
“no history of back pain prior to this job ... extreme pain for several months ... five [doctors] in agreement ... that my condition is work related and I must pursue a new line of work ... condition is getting worse, therefore I have no choice but to file for workmen’s compensation.”
And on October 23, after the allegedly disabling stabbing pain, plaintiff wrote and delivered to his employer a “To whom it may concern” note: “Due to the extreme pain associated with my condition, I will not be able to return to work until I have been rehabilitated.”
The trial judge reasoned that plaintiffs congenital condition was aggravated by the overhead work, constituting an accident with injury that prevents plaintiffs doing overhead work. The result, the judge concluded, was a non-total disability that entitles plaintiff to supplemental earnings benefits. We disagree.
To recover workers’ compensation supplemental earnings benefits, an employee must first show an injury by work-related accident, as defined by R.S. 23:1021(1):
an unexpected or unforeseen actual, identifiable, precipitous event happening suddenly or violently, with or without human fault, and directly producing at the time objective findings of an injury which is more than simply a gradual deterioration or progressive degeneration.
It is clear that plaintiffs uncontroverted testimony, believed by the trial judge, of “sharp, stabbing pain in [his] back” while twisting a fuel nozzle overhead into an airliner’s under-wing fuel valve, satisfies plaintiffs burden of proving the “event.”
|5Less clear is whether muscle spasm not seen by a doctor until November 19, 27 days after the event of October 23, could satisfy the burden of proving the event as one “directly producing at the time objective findings of an injury” (of whatever severity).[5]
Quite clear, however, is that plaintiff has not satisfied his burden of proving, as required by R.S. 23:1221(3), that any injury of October 23 disables him from earning 90% of his former earnings.
The only doctors plaintiff saw on or after October 23 were Dr. Graham (who did not testify, though he saw plaintiff 10/23, 28, and 30; and 11/1, 6, 8, 11, and 18) and Dr. *661 Underwood (who did testify, but saw plaintiff only once post-event, on 11/19).
Dr. Graham’s medical records do not give any detail for those post-event visits beyond two or three word comments (perhaps describing x-rays taken). Those records afford no evidence even of injury, much less of a disability that would prevent plaintiffs working at a job paying 90% of his former earnings.
Dr. Underwood had seen plaintiff 29 times between January 2 and October 9, 1991, but did not see him after the October 23 event until November 19. Dr. Underwood’s testimony of that one post-event visit is footnoted.[6] He, like Dr. Graham, is silent on any objective findings of injury save muscle spasm 27 days after thejeevent, which he does not connect to the event; and he is especially silent on any disability to earn 90% of former earnings.
The medical evidence set out in footnote 2 shows that plaintiffs disability to do overhead work without pain has long existed, even when he first changed assignments at his job, from parking and fueling small private aircraft, to overhead fueling of commercial aircraft. That evidence (while it reasonably shows a disability to do overhead work) further shows that plaintiffs inability to work overhead without pain was not the result of the pain from his overhead work, but the result of his congenital condition. The pain did not cause the condition: rather, the condition caused the pain, as Dr. Underwood’s uncontradicted testimony, quoted in fn. 2, shows.[7] Thus we conclude that the event of October 23 did not disable plaintiff, and for that reason alone we would reverse.
Yet also requiring reversal is that plaintiff offered not only no medical evidence, but no other evidence to prove, and did not prove, that his inability to do overhead work prevented his finding a job paying 90% of his $7.50 per hour wages.
“The threshold prerequisite to the recovery of supplemental earnings benefits, as set forth in subparagraph (3)(a) [of R.S. 23:1221] is that the employee’s injury result in his ‘inability to earn wages equal to ninety percent or more of the wages he was earning at the time of the injury.’” Payne v. Country Pride Foods Ltd., 525 So.2d 106, 109 (La.App. 3d Cir.1988). The injured employee thus bears the burden of proving by a preponderance of the evidence that the injury resulted in his inability to earn that amount. The analysis is necessarily a facts and circumstances one in which the court is mindful of |7the jurisprudential tenet that worker’s compensa *662 tion law is to be liberally construed in favor of coverage.
Daigle v. Sherwin-Williams Co., 545 So.2d 1005, 1006-1007 (La.1989). See also Freeman v. Poulan/Weed Eater, 93-1530 (La. 1/14/94), 630 So.2d 733.
In comparison with the present case, where there is no medical evidence of near-total disability, and no testimony of any effort whatsoever to find employment, nor any expert opinion or employment agency advice that no employment was available for one who could not do overhead work, the Daigle case exemplifies the proof of inability to earn 90% of wages:
Mr. Daigle successfully bore his burden of proving his disability and resultant inability to earn at least 90% of his pre-injury wages. Testimony from the treating physician as well as from the doctor who examined Daigle at Sherwin-Williams’ request indicated that he suffered a ten to fifteen percent anatomical disability and should not lift, push, or pull anything more than fifty pounds. As manager of the Sherwin-Williams paint store, he was expected to do a considerable amount of lifting and carrying, often of loads in excess of his fifty pound limitation. It follows that it is likely that he would encounter the same requirements and accompanying problems in another such job. In addition, the record revealed that he had made several attempts at gainful employment. Although plaintiffs work history was in hardware and in paint stores, he attempted to find work outside of his past field.
Daigle, 545 So.2d at 1008.
In the present case, there is no medical evidence other than that, because of his congenital condition, plaintiff cannot do overhead work, especially while his head is turned, without experiencing pain. No medical evidence suggests he has any disability to perform any other physical or mental effort. No medical or other evidence suggests that he could not do the work he was doing before he switched to commercial airliner refueling.
And, as far as the record shows, plaintiff made no effort to find work. He did not even ask his employer to return him to his previous assignment of parking and fueling light aircraft, which did not require overhead work.
Plaintiff did not meet his burden of proving that he could not earn 90% of his wages, notwithstanding his congenital inability to do overhead work without pain.
In sum, pretermitting whether there were objective findings “at the time” of the October 23 incident, and whether any then injury was uneompensable deterioration or degeneration, we conclude |8that plaintiffs only disability to work overhead results not from working overhead but from his congenital condition detailed by Dr. Underwood; and that plaintiff did not, in any case, prove that his disability to work overhead renders him unable to earn 90% of his former earnings. The hearing officer’s view that plaintiffs congenital condition was aggravated by injury of October 23, 1991 or other work injury, and that that aggravation disabled plaintiff to do overhead work and thereby prevented his earning 90% of former earnings, is clearly wrong.
Reversed; judgment for defendant at plaintiffs cost.

.Dr. Underwood, chiropractor, was the only medical witness (by deposition; the evidence from other doctors is by office records or reports). All emphasis in his testimony and all other medical evidence has been supplied. He testified: Q. Your x-ray findings indicated an enlarged transverse process at C-6, C-7, and enlarged tubercle of first right rib. A. Yes, sir.... Q. [W]as this congenital condition being aggravated by his occupation of a commercial jet airline loader? A. Yes, sir, it was-
Q. On line 15 [of a form report] you put "considering the patient’s physical make-up, occupation of this nature is contraindicated. Any occupation requiring this individual to do lifting or straining with hands overhead will cause recurring symptoms.” Is that the same as what you were talking about doing overhead work with your head rotated? A. Yes, sir. Q. And is this aggravating that enlarged transverse process at C-6, C-7? A. No. The enlarged transverse process irritates the neurovascular bundle. That is what causes the symptom. It is the restriction of area— in that area that the nerves are just irritated or pinched. Or in his case, these are irritated from pressure between the pressure of the hose and the extended transverse process; and what is in between that is the neurovascular bundle which is nerve and artery and vein. So, it being extended, there is not enough room or a way or position or a location for the neurovascular bundle to get out of the way. Q. Okay. So, this enlarged process of the vertebra at C-6, C-7 have caused a smaller area for these nerves to be located. A. Yes, sir. Q. And when he embarks upon putting this hose on his shoulder arid doing overhead work, that area becomes further restricted and restricts those nerves and causes this pain complex? A. Yes. And not only that, it makes them — it raises the neurovascular bundle up because it has to go over — the nerves have to go across the transverse process, and it gets them out of their normal position. Q. Was your initial exam showing hypersensitivity at the C-5, C-6 and the weakness in the right wrist consistent with congenital finding? A. Yes. Q. The Addison's maneuver being positive on the right, and the costoclavicular test being positive on the right, is that consistent with your impression? A. Yes, sir. Q. You don't feel that he could return to doing the type of work that he was doing with this condition, do you? A. No, sir, no....
Dr. Underwood stated that, even after October 23, "I don't remember him relating it to any particular injury. I can remember over and over and over the occupation in general aggravating the condition. Or he felt — well, I felt like it did and he did also.”
Dr. Clifford, neurosurgeon, on 8/30/1991 similarly wrote: "Mr. Holley’s symptom complex would suggest that this is an occupational problem. He has an essentially normal examination, and I believe he is faced with the situation of either changing his form of occupation or learning to live with his symptoms."

. Plaintiff had worked for defendant employer parking and fueling light aircraft, but was "promoted” to the under-wing refueling of airliners. That required that plaintiff first read and record fuel levels from all the under-wing gauges, then calculate the amount needed to meet the plane’s load planner sheet requirements. Then plaintiff had to ground the fuel truck to the plane, position a ladder and a deadman switch, pull the fuel hose (with 15-pound, "large single-point nozzle”), on his shoulder, about 30 feet under each wing; climb the ladder, raise the hose overhead, inserting its nozzle into the under-wing filling valves and twisting it a quarter turn to clamp it in place, and then deliver the previously-calculated amount of fuel while constantly monitoring the airliner’s gauges, constantly looking up.

. Records of Dr. Farries, orthopedic surgeon, (seen 10/9/91) note a “15-month histoiy of pain in the upper portion of his back. This apparently occurred when ... bench pressing and he felt a sharp pain in the upper part of his back.... He also states the pain is frequently associated with severe headaches.”
Records of Dr. Kinney, chiropractor, (seen 10 times in 1990: 7/17, 18, 25; 8/29, 31; 9/14, 17, 19, 21, 24) include: “Present complaint (1) 'Pinched nerve’ in Rt side of neck last two weeks, comes from bending head to pull area at head backward — sharp—7/10[?J—goes snap when straightens neck — neck tight, crickling sound w/ *660 rotation either way.... History of neck cricks after sleeping on couch this past W[?], 2 mos ago hurt neck lifting wts, later 1 wk — 2 wks ago hurt again doing butterflies [testimony: weight-lifting term] — sharp pain — heard something tear— couldn't turn head at first can now,_[?] sharp pain, neck 'creeks’ now — has thrown LB out 2x’s — last time was in '90, — 1st time 3 years ago." His notes also include 9/14, stabbing pain between shoulders; 9/19 sharp pains; 9/21, still sharp knife pains between shoulders; 9/24 crick in neck.
Records of Dr. Graham, chiropractor, of 10/15/91 (also seen 10/16, 18, 21, 23, 28, 30, 11/1, 6, 8, 11, and 18) report "had this condition for 1 — l-k yr. muscle spasm — shaip pain neck— shoulder — daily headaches."
Dr. Underwood, chiropractor, (seen 29 times in 1991: 1/2, 7, 10, 14, 2/4, 11, 13, 15, 18, 22, 27, 3/4, 15, 4/25, 5/14, 7/6, 9, 12, 17, 22, 29, 8/5, 8, 19, 9/12, 16, 20; 10/4, 9; 11/19, 25), gave plaintiff's then history as: “Patient has seen Dr. Kinney for a few months, no results; pain in cervical sprite radiating into right shoulder girdle. Started six months ago; patient lost range of motion July 13, 1990." Dr. Underwood testifies of complaints of pain and, usually, muscle spasm, in most visits.

. Considering the long history of frequent prior muscle spasm, perhaps this spasm may be inferred to have been present 27 days earlier, "at the time.” Yet, in view of the same history, it is also unclear whether this injury is, as the statute requires, "more than simply a gradual deterioration or progressive degeneration.” Even more troublesome is Dr. Underwood’s non-connection of the 27-day-later spasm with any earlier event such as that of October 23. He described plaintiff's general course between January and November as "improvement." "Well, at times, like 11-19, I do have, you know, pain and muscle spasm. There was — now, some of this — and like on 7-6, pain in cervical spine_ [I]t was obvious there were dates that he was worse than other ones, yes.”

. Q. [D]o you remember why he requested the consultation? A. No.... I just remember him discussing what had transpired up to date about his job aggravating — or, you know, the pain and muscle spasm, the headaches and discomfort he was having and relating it to his job. Q. Did he relate a particular incident that caused him to get worse, or did he relate to you that the constant repetition of his job caused his symptoms to become aggravated? A. I don’t remember him — no, I don’t remember him relating it to any particular injuty. I can remember over and over and over the occupation in general aggravating the condition. Or he felt — well, I felt like it did and he did also. But no — he didn’t point to any particular injury or incident. Q. What about after the 19th of November? A. November 25th.... Q. Did you see him after the 25th of November? A. No, sir, I didn’t....

. Additionally, Dr. Underwood testified that over the course of his treatment plaintiff improved, though he had ups and downs. "Q. Over the time that you had treated him from the 2nd of January to the 25th of November, how would you describe the progress of his condition? And by that I mean, did he get worse; did he get better; did he remain the same, or can you say? A. Improvement. It was sporadic, at times better than others, and I would like to say a gradual improvement or a constant — or a consistent improvement. He did improve and then it just stayed at that level of ups and downs from there. But it did improve from the original — or from the first visit.... From there on out, it would just be up and down depending on what he had done.... That would he my general assessment. Q. And as of the 25th of November, 1991, would your diagnosis have remained the same as what we had talked about previously, moderate cervical sprain, thoracic outlet syndrome, costoclavi-cular syndrome and scalenus anticus? A. Yes, that would, yes. Q. Okay.... Is there any particular point that you can pinpoint during your treatment that he got significantly worse than he did — than he was on January 2, '91? A. Well, at times, like 11-19, I do have, you know, pain and muscle spasm. There was — now, some of this — and like on 7-6, pain in cervical spine.... [I]t was obvious there were dates that he was worse than other ones, yes.